**Opinion issued March 18, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-13-00365-CV

————————————————

**JOAN DEYOUNG, STEPHEN DEYOUNG,
AND DAVID DEYOUNG, Appellants**

**V.**

**BEIRNE, MAYNARD, & PARSONS, L.L.P., Appellee**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2011-18770-A**

---

**MEMORANDUM OPINION**

In this appeal from a summary judgment, we determine whether an attorney-client relationship existed between a law firm and a real estate partnership because the general partner of the real estate partnership is also a partner of the law firm.

We conclude that such a relationship does not exist in this case, because neither the real estate partnership nor the plaintiffs engaged the law firm to perform legal services, and the services that the general partner performed were solely in his capacity as general partner of the real estate partnership. Accordingly, we affirm the summary judgment in favor of the law firm.

## Background

Joan, Stephen, and David DeYoung are general partners in Russell, Page, and Partners, a Texas general partnership. Together, they sued Beirne, Maynard & Parsons L.L.P, contending that the law firm vicariously owed the DeYoungs a fiduciary duty in connection with real property transfers that William Maynard, another general partner in the real estate partnership, made, allegedly to the detriment of the real estate partnership. Maynard is also a partner of the Beirne Maynard, and Parsons law firm. In addition to the law firm, the underlying suit names William Maynard, individually; Judy Maynard, his wife, and the partnership's trustee; and Maynard Properties, L.P., the grantee in the property transfers, as defendants.

### *Partnership history*

In 1966, the DeYoungs, the Maynards, and several others formed Russell Page as a general partnership to invest in real property in Liberty County, Texas. In 1991, according to the DeYoungs' allegations, Mrs. Maurice Page—the

2

partnership's trustee and William's mother-in-law—transferred approximately twenty acres of partnership land to William without notifying the other partners.

In 1994, Page informed William of her intent to resign as trustee and sought his advice in appointing her daughter (and William's wife), Judy Maynard, to be substitute trustee. William sent a letter to Page acknowledging her intent to resign and informing her of the procedure for accomplishing the appointment. That correspondence was typed by firm administrative staff onto letterhead printed with "William Maynard" and the firm address, but without mention of the law firm.

In connection with Page's resignation and Judy's appointment, William prepared a general warranty deed to transfer the partnership's land holdings from Page to Judy as the substitute trustee. William, assisted by firm administrative staff, sent the executed deed to the Liberty County clerk's office along with a transmittal letter, prepared on firm letterhead and signed by him, and a check drawn on the law firm's operating account for the $19.00 filing fee. The transmittal letter directed the clerk to return the recorded deed to "William Maynard, c/o Beirne, Maynard & Parsons" at the firm address. William also used the firm letterhead in a 2001 transmittal letter to the Internal Revenue Service accompanying the partnership's 2000 tax return. William signed the return as preparer, but the return form does not specify the capacity in which he signed, nor does it mention the name of the law firm.

3

In 2010, Judy, acting as the partnership's trustee, transferred 47.49 acres held by the partnership to Maynard Properties, L.P. The transmittal letter for recording and filing the deed was prepared on the letterhead printed with "William Maynard" and the firm address but without the law firm name. The letter requests that the deed be returned to William at the firm address. The firm address also appears on the partnership's bank account.

### *Course of proceedings*

The DeYoungs' suit against the law firm contends that these facts establish that an attorney-client relationship existed between the law firm and either them or the Russell Page partnership. The law firm moved for summary judgment on the claims against it, contending that no attorney-client relationship existed between it and either group as a matter of law. The firm supported its motion with an affidavit executed by John George, Executive Director of the law firm. George averred that the law firm records show that neither the partnership nor any of the DeYoungs has ever sought or obtained legal services from the firm and that the law firm has never rendered legal services to any of them.

George's affidavit addresses William's transmittal correspondence relating to the land transfers and the other partnership business. It declares that those records

> do not reflect involvement by or on behalf of the law firm. They were created on either William Maynard's personal letterhead or in his

4

individual capacity. William Maynard's personal account was charged for the personal expense of $19.00 incurred in filing legal documents on Mr. Maynard's personal business.

Attached to George's affidavit is the law firm's policy, entitled "Outside Correspondence":

It is the policy of the Firm that written correspondence directed to persons or entities, other than Firm personnel, that pertains to the Firm's practice or Firm-related business, should be typewritten using the Firm's letterhead, with the office address of the Firm location from which the correspondence is sent. . . . Attorneys who wish to use the address of a Firm office are encouraged to use personal letterhead for that purpose.

George averred that the law firm was unaware that Judy Maynard served as the partnership's trustee. The trial court granted summary judgment to the law firm and severed the case against the law firm from the remaining defendants, rendering it a final judgment.

## Discussion

### *Standard of review*

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any one of the grounds is meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When reviewing a summary judgment motion, we must (1) take as true all evidence favorable to the nonmovant and (2) indulge every reasonable

5

inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (citing *Provident Life & Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)).

The firm's motion requests summary judgment on both traditional and no-evidence grounds. In a traditional summary judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). The defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. S*ci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). In a no-evidence motion for summary judgment, the movant asserts that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524.

***Attorney-client relationship***

To recover on a breach of fiduciary duty claim, a plaintiff first must show that the defendant owed a fiduciary duty. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (enumerating elements of breach of fiduciary duty claim as existence of fiduciary duty, breach of that duty, causation, and damages). An attorney has a fiduciary duty to a client when an attorney-client relationship is created. *See Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988); *Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 623 (Tex. App.—Houston [1st Dist.] 1993, writ denied). An attorney-client relationship is a contractual relationship in which an attorney agrees to render professional services for a client; the relationship may be established expressly or be implied from the conduct of the parties. *Kennedy v. Gulf Coast Cancer & Diagnostic*, 326 S.W.3d 352, 357–58 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Mellon Serv. Co. v. Touche Ross & Co.*, 17 S.W.3d 432, 437 (Tex. App.—Houston [1st Dist.] 2000, no pet.). The DeYoungs concede that the parties did not expressly reach an agreement to provide legal services; instead, they contend that they have raised facts to allow an agreement to be implied.

In determining whether an attorney-client relationship can be implied, we examine the conduct of the parties using an objective standard, determining whether the parties' communications or actions manifest that both parties intended

7

to create an attorney-client relationship; we do not consider the parties' unstated, subjective beliefs. *Kennedy*, 326 S.W.3d at 357–58. A law firm does not have an attorney-client relationship if the purported client neither sought nor obtained legal services from the law firm. *See Green's Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.*, 178 S.W.3d 40, 43–44 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

At the outset, the DeYoungs complain that George's statements that neither the DeYoungs nor the partnership ever "sought or obtained legal services" from the law firm and that the firm "never rendered legal services or advice" to the Youngs or the partnership do not negate the implied existence of an attorney-client relationship because those statements are conclusory. An affidavit that does not provide underlying facts to support a conclusion is conclusory. *See Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no pet.). George, however, supported those statements with reference to the contents of the law firm's records and the absence of the DeYoungs and the partnership from the firm's records relating to its clients. These are factual statements properly considered as summary-judgment evidence. The Beirne, Maynard law firm established through George's affidavit that neither the partnership nor the DeYoungs sought or obtained legal services from it. The DeYoungs did not

8

adduce a countering affidavit but instead relied on William Maynard's dual status as a partner of both the real estate partnership and the law firm.

Given his concurrent status as a general partner in the Russell Page partnership, William Maynard's status as a partner in the law firm, standing alone, is insufficient to raise a fact issue that his actions constituted legal services within the course and scope of the law firm's business. *See* TEX. BUS. ORG. CODE ANN. § 152.301 (West 2012) ("Each partner is an agent of the [general] partnership for the purpose of its business.").

The firm policy accompanying its summary judgment motion instructs firm attorneys to use personal letterhead, on which they may list the address of a firm office, for matters that do not pertain to the firm's practice or firm-related business. The correspondence between William Maynard and the partnership—that being the 1994 letter to Page, as trustee, concerning her intended resignation—was prepared on letterhead compliant with this policy. William's use of firm letterhead in transmittal correspondence to third parties, which occurred twice over a fourteen-year period, does not raise a fact issue to support the DeYoungs' allegation that the law firm affirmatively had agreed to provide legal services to either the partnership or the DeYoungs. *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (explaining that "[e]vidence that is so slight as to make any inference a guess is in legal effect no evidence").

The DeYoungs claim that a fact issue nevertheless exists as to whether the law firm reasonably should have known that an attorney-client relationship was formed between the firm and the DeYoungs. *See Span Enters., Inc. v. Wood*, 274 S.W.3d 854, 857–58 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting that attorney-client relationships, like other contracts, can be implied by parties' actions) (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 4 (2000)). The authorities that the DeYoungs rely on, however, demonstrate that materially different circumstances must exist to raise a fact issue about the existence of an attorney-client relationship by implication.

In *Cook v. Brundidge, Fountain, Elliott & Churchill*, the Texas Supreme Court considered whether an existing attorney-client relationship between Cook and the firm, created when Cook retained firm partner Lyon to represent her in her divorce, extended to Lyon's alleged fraud in connection with his real estate investment advice and his handling of an investment for her. 533 S.W.2d 751 (Tex. 1976). In an affidavit supporting her summary-judgment response, Cook testified that she sent her investment funds to Lyon in a check payable to Lyon "as [her] attorney" and that Lyon assured her that, as her attorney, he would hold the funds pending their investment. *Id.* at 754. Lyon also represented to Cook that he had prepared the mortgage contract for her investment and assured Cook, as her attorney, that her interests were well-protected. *Id.* at 753. The Texas Supreme

10

Court held that the firm did not conclusively prove that it was not vicariously liable for Lyon's acts in connection with the investment matter because the record contained no evidence that either the partner or the law firm informed the client that Lyon was not representing Cook as a member of the firm in the investment matter. *Id.*

In *Vinson & Elkins v. Moran*, the law firm represented the "Moran interests," which firm lawyers explained variously to mean "the Moran family, the Moran Estate, the Moran Estate Family, [and] Moran Estate interests." 946 S.W.2d 381, 403 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd). The court of appeals held that the evidence was legally and factually sufficient to support the jury's finding that an attorney-client relationship existed between V&E and the beneficiaries. *Id.* at 405. Among other evidence, the court observed that the estate beneficiaries received direct mailings from the firm, and firm lawyers held formal meetings with the beneficiaries to discuss Estate issues. *Id.* at 403. Firm lawyers interacted and communicated directly with the beneficiaries throughout the administration; they invited the beneficiaries to call them directly if they had any questions. *Id.* at 403–04. One family member and beneficiary sought advice directly from a V&E lawyer when she had concerns about signing a document. *Id.*

In *Bright v. Addison*, the court of appeals found sufficient evidence of an attorney-client relationship to uphold the trial court's ruling, following a bench trial, where the attorney provided legal advice and billed for that advice. 171 S.W.3d 588, 597 (Tex. App.—Dallas 2005, pet. dism'd). He also sent an engagement letter that discussed an attorney-client relationship, and the attorney did nothing to later inform the putative clients that they were mistaken about the existence of an attorney-client relationship. *Id.*

In contrast to these cases, the DeYoungs have not identified any evidence that William or the law firm undertook any action that led anyone in the real estate partnership to believe that the law firm represented the partnership—evidence that is necessary to give rise to an affirmative duty to disclaim the existence of an attorney-client relationship. *See Cook*, 533 S.W.2d at 753. Rather, the facts here are more like those in *Span Enterprises*. 274 S.W.3d 854. In that case, we held that no attorney-client relationship could be implied where neither plaintiff knew that the attorney was involved in drafting the partnership documents, ever communicated with him, or ever received or paid for legal services. *See id.* at 857–58.

The DeYoungs' unstated perceptions of William's role as a partner in their partnership business do not raise a fact issue concerning the existence of an attorney-client relationship between the law firm and the partnership, where none

12

was communicated by either party.   Because the DeYoungs point to no evidence that the parties mutually intended to form an attorney-client relationship, we hold that the trial court properly concluded that one could not be implied.

### *Knowing participation in breach of fiduciary duty*

The trial court also granted summary judgment against the DeYoungs on their claim that the law firm knowingly participated in Judy Maynard's alleged breach of fiduciary duty.  To establish that a defendant knowingly participated in another's breach of fiduciary duty, a plaintiff must prove that the defendant (1) knew of the fiduciary's breach of duty to the plaintiffs and (2) was aware that it was participating in the breach of fiduciary duty.  *Helm Co. v. Shady Creek Hous. Partners*, No. 01-05-00743-CV, 2007 WL 2130186 (Tex. App.—Houston [1st Dist.] July 26, 2007, pet. denied) (mem. op.) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942)); *see Cox Tex. Newspapers v. Wooten*, 59 S.W.3d 717, 722 (Tex. App.—Austin 2001, pet. denied).

George's affidavit, in which he averred that the firm was unaware that Judy served as the partnership's trustee, negates the first element of the DeYoungs' claim.  The DeYoungs again respond that William Maynard used the law firm's address, employees, and resources in connection with the partnership's business and Judy Maynard's actions as trustee.  The evidence, however, shows incidental use of clerical services and personal use of the firm address and bank account,

13

consistent with firm policies for outside business interests. The summary-judgment record is bereft of evidence that any law firm staff involved in providing those services knew of the real estate partnership's activities beyond the information contained in the deeds, tax returns, and transmittal correspondence, none of which, standing alone, discloses any breach of fiduciary duty by Judy Maynard.

The DeYoungs further contend that the law firm has imputed knowledge of William's services to the partnership by virtue of his status as a named partner in the firm and that he knowingly participated in his wife's breach of fiduciary duty. Because none of the evidence adduced supports a finding that William acted as a law firm partner, rather than the general partner in the real estate venture that he was, this contention is without merit. The law firm can be held liable only for the wrongdoings of its agents committed in the course and scope of their duties; imputed knowledge is insufficient to find knowing participation in a breach of fiduciary duty. *See Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) ("The general rule is that an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired.").

## Conclusion

The trial court properly granted summary judgment in favor of the Beirne, Maynard, and Parsons law firm on the DeYoungs' claims. Accordingly, we affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

15